**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TERRY J. YALE, | 1:12-cv-01429-AWI-SAB |
| Plaintiff, | **JUDGMENT** |
| v. | Date of Trial:      June 17, 2013 |
| SUN LIFE ASSURANCE COMPANY OF CANADA, a Michigan corporation, | Date Submitted:   September 24, 2013 |
| Defendant. | |
| _____/ | |

## I. INTRODUCTION

The Court held a bench trial in the above-captioned matter on June 17, 2013, with attorney Russell Gene VanRozeboom appearing for plaintiff Terry J. Yale ("Plaintiff" or "Yale") and attorney Dennis J. Rhodes appearing for defendant Sun Life Assurance Company of Canada ("Defendant" or "Sun Life").  The Court then set a briefing schedule directing the parties to file and serve proposed findings of fact and conclusions of law.  After proposed findings of fact and conclusions of law were filed, the Court took the matter under submission.  Having considered

the argument of counsel and all competent and admissible evidence submitted, the Court hereby enters judgment in favor of Sun Life and against Yale for reasons discussed below.

## II. FACTS AND PROCEDURAL BACKGROUND

The Court refers the parties to previous orders for a complete chronology of the proceedings. On August 30, 2012, Yale filed her complaint against Sun Life for recovery of plan benefits and attorneys' fees pursuant to 29 U.S.C. § 1132. Yale alleged as follows:

> "Plaintiff is the beneficiary under a group life insurance policy issued as part of an employer plan established and maintained by Watts Water Technologies (the 'Plan'). Plaintiff's claims arise under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. section 1001, et seq., and specifically section 1132(a)(1)(B) thereof."

Yale further alleged:

> "Sun [Life] was the Plan Administrator for the Plan and issued the group life policy under which [P]laintiff claims benefits. [¶] . . . [¶] At all relevant times mentioned herein, [P]laintiff was an employee of Watts Water Technology and eligible to participate in Plan benefits."

Yale further alleged:

> "During an open enrollment period in December 2009, [P]laintiff submitted an application under Sun Life's Group Policy number 27578 for $250,000 of Optional Dependent Life Insurance benefits for [P]laintiff's husband, John H. Yale. As the spouse of [P]laintiff, John H. Yale was eligible for up to $250,000 of coverage."

Yale further alleged:

> "In January 2010, Sun Life processed the application submitted by [P]laintiff, calculated the premiums applicable for $250,000 of coverage for John H. Yale, and sent monthly invoices to Watts Water Technologies confirming the $250,000 of coverage and

premium therefor.   All monthly invoices sent by Sun Life to [P]laintiff's employer were duly paid."

Yale further alleged:

"John Yale died unexpectedly on October 10, 2010, from septic shock after Sun Life had billed and collected ten consecutive months of premiums for the $250,000 of coverage.   During the time it was billing and collecting premiums for the $250,000 of life insurance coverage for John Yale, Sun Life did not notify anyone that additional paperwork was needed for this coverage amount; nor did Sun Life attempt to refund any premium it had collected or otherwise give notice that it was cancelling or limiting coverage."

Yale further alleged:

"On October 18, 2010, [P]laintiff submitted a claim for policy benefits of $250,000 as the beneficiary under the policy.  By letter dated December 20, 2010, Sun Life refused to pay any benefits over $100,000.   [¶]  On June 8, 2011, [P]laintiff appealed Sun Life's denial of $150,000 in death benefits.   On November 10, 2011, Sun Life denied [P]laintiff's appeal and refused to pay any portion of the additional $150,000 death benefit.   Plaintiff has exhausted her administrative remedies under ERISA and is now entitled to seek recourse with this Court."

Yale further alleged:

"By denying $150,000 of death benefits, Sun Life has wrongfully breached its obligations owing to [P]laintiff as a beneficiary under Group Policy number 27578 and [P]laintiff is entitled to an amount in the sum of $150,000, plus interest.   [¶]  29 U.S.C. sec. 1132(g)(1) authorizes this Court to award reasonable attorney fees to a beneficiary who brings an action to recover benefits under the Plan.  Plaintiff has retained the services of legal counsel and has necessarily incurred attorney fees and costs in prosecuting this action in a final amount which is currently unknown.   Plaintiff therefore requests and [sic] award of reasonable attorney fees according to proof."

On October 5, 2012, Sun Life filed its answer to Yale's complaint, asserting specific denials of certain allegations and fourteen affirmative defenses.  By its tenth affirmative defense, Sun Life alleged Yale's claim was barred by her failure to provide evidence of insurability.

3

On February 12, 2013, Sun Life lodged its administrative record with the Court.  On April 24, 2013, the parties filed their respective trial briefs.  On May 15, 2013, the parties filed their responding trial briefs.  The Court convened for a one-day bench trial on June 17, 2013. Pursuant to trial, Yale filed her proposed findings of fact and conclusions of law on August 29, 2013; Sun Life filed its proposed findings of fact and conclusions of law on August 30, 2013.

### III. LEGAL STANDARD

Under 29 U.S.C. § 1132(a)(1)(B), the statute invoked by Yale, "[a] civil action may be brought-- [¶] (1) by a participant or beneficiary [of an employee benefit plan]-- [¶] . . . [¶] (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B)," as in this case, "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (italics original).  "[I]f the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006) (citing *Bruch, supra,* 489 U.S. at 115) (emphasis original).  The plan at issue here provides in pertinent part:

> "The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment

4

1

2      information provided by the Policyholder, and the amount of any
       benefits due, and to construe the terms of this Policy.

3

4      Any decision made by Sun Life in the exercise of this authority,
       including review of denials of benefits, is conclusive and binding
       on all parties.  Any court reviewing Sun Life's determinations
5      shall uphold such determination unless the claimant proves Sun Life's
       determinations are arbitrary and capricious."

6

7   (Doc. 11-1 at 113.)  Because the plan unambiguously vests the administrator with discretion both

    to determine a participant's eligibility for benefits and to construe the terms of the plan itself, an
8
    abuse of discretion review applies.  *See Abatie, supra,* 458 F.3d at 963-65.  The Court's task is to
9
    determine whether an abuse of discretion occurred.  "In an action tried on the facts without a
10
    jury," as here, "the court must find the facts specially and state the conclusions of law separately.
11
    The findings and conclusions may be stated on the record after the close of the evidence or may
12
    appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).
13
    In doing so, the court "can evaluate the persuasiveness of conflicting testimony and decide which
14
    is more likely true."  *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1095 (9th Cir. 1999); *accord*
15
    *Schultz v. Butcher,* 24 F.3d 626, 632 (4th Cir. 1994) ("For a bench trial . . . , the district court can
16
    hear relevant evidence, weigh its probative value and reject any improper inferences").
17

18                          **IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW**

19

20  Yale has been employed by Watts Water Technologies ("Watts") as a sales representative since

21  March 2000.  (Doc. 11-1 at 23, 25.)  As recently as 2009, Watts offered its employees and their

22  dependents voluntary life insurance through a policy administered by Reliance Standard Life

23  Insurance Company ("Reliance").  Yale and her husband John Yale (not a Watts employee) had

24  life insurance coverage under the Reliance policy in the amount of $100,000 each.  (*Id*. at 11-14.)

25

26                                                    5

Watts transferred its life insurance policy from Reliance to Sun Life effective January 1, 2010.  (Doc. 11-1 at 23, 75.)  By its terms, the Sun Life policy allowed Watts's employees to elect a maximum dependent spouse optional benefit of $250,000, but with a guaranteed issue amount – defined as "the maximum amount of insurance available under the policy without evidence of insurability" – equal to the amount of dependent spouse optional life insurance the employee had in force on December 31, 2009.  (*Id*. at 82, 86.)  The Sun Life policy provided:

> "If the Employee's or Dependent's amount of insurance exceeds the Guaranteed Issue Amount available under this Policy, any amount in excess of the Guaranteed Issue Amount is available to the Employee or Dependent only if he has furnished Evidence of Insurability to Sun Life and has been approved for any excess amount above the Guaranteed Issue Amount."

(*Id*. at 86.)  The Sun Life policy further provided:

> "**Evidence of Insurability** means a statement of proof of an Employee's or Dependent's medical history upon which acceptance for insurance will be determined by Sun Life.  The Employee or Dependent must agree to submit to a paramedical examination and/or provide copies of medical records, if requested by Sun Life.  Sun Life will pay the cost of any paramedical examination ordered by Sun Life for the purpose of providing Evidence of Insurability."

(*Id*. at 85 (bold original).)  Because John already had $100,000 of dependent life insurance in force under the Reliance policy at the time of the transfer, he was entitled to an issue amount of $100,000 under the Sun Life policy without evidence of insurability.  (*See id*. at 82.)

Watts commenced a brief open enrollment period for its employees in late 2009, presumably to allow them to purchase new coverage or modify their existing coverage.  On November 30, 2009, during the open enrollment period, Yale executed an optional enrollment form electing to purchase life insurance coverage under the Sun Life policy (hereinafter referred

6

to as "the policy") in the amount of $250,000 for herself, $250,000 for John, and $10,000 for
their children.  (Doc. 11-1 at 28.)  As to benefit elections, the enrollment form provided:

> "(Make your benefit elections below based on the coverage options
> described here) [¶] . . . [¶] **For your spouse**: An amount between
> $10,000 and $250,000, in increments of $10,000. *Amounts
> available with no evidence of insurability required: Up to $20,000
> if under age 60,* $0 for ages 60-74.  Spouse coverage cannot
> exceed 100% of the employee's combined Basic & Optional Life
> Coverage.  Coverage ends when your spouse turns 75 years old."

(*Id*. (bold original, emphasis added).)  The enrollment form further provided:

> "About Evidence of Insurability (also known of Proof of Good
> Health): [¶] *Evidence of Insurability (EOI) is needed if:* [¶] · *You
> apply for higher coverage than the limits described in the
> Coverage Options above.* [¶] · You want to increase your existing
> coverage now (whether your existing coverage is with Sun Life
> Assurance Company of Canada or a prior insurance carrier). [¶] ·
> You want to increase your coverage at a later date. [¶] · You
> decline coverage and then want it at a later date. [¶] If EOI is
> needed, your coverage will not go into effect until Sun Life
> Assurance Company of Canada approves it."

(*Id*. at 29 (emphasis added).)  Yale did not provide evidence of insurability on behalf of John
when she submitted the enrollment form, despite having selected a coverage amount ($250,000)
for John that exceeded the amount available with no evidence of insurability (an amount
ordinarily limited to $20,000, but raised to $100,000 by virtue of John's preexisting coverage).

Premiums for John's dependent life benefit were subsequently deducted from Yale's
monthly earnings by Watts.  (*See* Doc. 11-1, at 4.)  On October 10, 2010, after nine or ten
months of premiums had apparently been deducted, John passed away.  *Id*. at 3.

On October 18, 2010, Cheryl Lundin, Watts's benefits manager, submitted a death
benefits claims packet to Sun Life on behalf of Yale as John's beneficiary seeking to recover the
$250,000 in dependent life benefits under the policy.  (Doc. 11-1, at 1.)  Between December 8,
2010 and December 15, 2010, Lundin corresponded with Sun Life claims associate Lisa Larson

7

regarding the "back up paperwork" (*id*. at 17) necessary for coverage above John's guaranteed issue amount. Specifically, Larson wanted to know whether Yale had submitted evidence of insurability and if so, whether it was approved. (*Id*. at 16.) Lundin informed Larson there was no record of any evidence of insurability form having been completed for John. (*Id*.) Larson later confirmed with Sun Life medical underwriting consultant Kevin J. Marshall that Sun Life had no record of ever receiving evidence of insurability. (*Id*. at 15.)

On December 20, 2010, Larson sent a letter to Yale accompanied by a $100,000 check. (*See* Doc. 11-1, at 19-22.) The letter stated in pertinent part as follows:

> "We have enclosed a check for $100,000, payable to you, in full payment of the Optional Dependent Group Life Insurance Benefits . . . . [¶] At this time, we have completed our review of the claim and find your spouse was not insured for $250,000 of Optional Dependent Life Insurance, but rather $100,000 of Optional Dependent Life Insurance, reflecting the amount you had in force as of December 31, 2009. In order for the additional $150,000.00 to be added to your Optional Dependent Spouse Life Insurance, you would have needed to complete Evidence of Insurability for your spouse, and be approved by Sun Life Financial, and there is no record that this had been completed. Due to the lack of Evidence of Insurability being submitted for your spouse, we regret to inform you that we have determined that $150,000.00 of the Optional Dependent Life Insurance Benefits is not payable[.]"

(*Id*. at 19.) The letter stated that if Yale disagreed with Sun Life's decision, she could request a review of the denial in writing within 180 days, and Sun Life would review the claim on receipt of the written request for review with notification to follow within a reasonable period of time, but no later than 45 days after receipt of the request. (*Id*. at 20.) The letter further stated, "You may have the right to bring a civil action under the Employee Retirement Income Security Act of 1974 (ERISA), § 502(a) following an adverse determination on review." (*Id*. at 21.)

On February 24, 2011, Alan Hurley, Watts's Director of Compensation and Benefits, sent a letter to Sun Life senior sales representative Derek Warner confirming a conversation Hurley and Warner apparently had in December 2010 regarding Yale's claim.  Hurley's letter stated:

> "Terri Yale had elected $250,000 of voluntary life insurance on her enrollment application for both herself and her husband John. When her husband passed away in October of 2010, she expected to receive a death benefit payment of $250,000 for her spouse. Unfortunately, an Evidence of Insurability (EOI) application was never received or reviewed by Sun Life for the difference between the $100,000 prior coverage amount approved by Reliance, and the $250,000 benefit amount she had elected during the enrollment process.  The death claim was subsequently processed in December 2010, with a $100,000 benefit payment based on the fact that at EOI application was never submitted, matching the prior carriers [sic] approved amount."

(Doc. 11-1, at 24.) Hurley's letter further stated:

> "[T]here are several extenuating circumstances that we believe should be reconsidered regarding this benefit claim situation.
>
> Terri [sic] Yale is one of our sales representatives who works out of her home in Clovis CA, and therefore has limited access to HR support remotely.  Although she did receive our annual enrollment communication package with benefit changes effective 1/1/2010, she was never advised by either Sun Life or Watts that she needed to submit an EOI application for her spouse, after her enrollment form was submitted.  Additionally, Sun Life began to bill Watts for the full $250,000 voluntary benefit amount for both Terrie [sic] and her husband effective January 1, 2010.  This administrative billing error was never corrected by Sun Life and continued through the date of John's death.  Although Watts properly set up the payroll deductions for the $100,000 amount previously approved by Reliance, we subsequently amended the deduction amount to be in agreement with the actual billing by Sun Life."

(*Id.*) Hurley's letter further stated:

> "Based on these unusual circumstances, and the administrative errors which occurred in both of our processes, we are requesting a settlement of this dependent life insurance claim that would be shared equally for the discrepancy in benefit amount that exists. We are not asking Sun Life to admit fault, but feel that a fair and

9

> equitable resolution of the misunderstanding should be shared
> equally by all the parties involved, including the employee.
>
> Watts will agree to pay Sun Life an additional $50,000 premium
> payment under our policy and we request that Sun Life reprocess
> and pay an additional death benefit amount of $100,000 to Terri
> Yale for her dependent spouse."

(*Id*. at 23-24.)

On March 2, 2011, Sun Life claims analyst Kristen Goodwin sent a letter to Hurley stating, "Your letter dated February 24, 2011 which requests an appeal of Sun Life Assurance Company of Canada's denial of the life insurance claim involving [Yale] was received in our office on February 28, 2011. [¶] We have nothing in our file to indicate that you are authorized to represent the beneficiary in this matter or to file an appeal on his or her behalf. In order begin [sic] the appeal process, please have the beneficiary sign the enclosed Authorization Form and return it to my attention." (Doc. 11-1, at 35.)

Yale appears to have retained counsel sometime in March or April 2011. On May 9, 2011, Sun Life deputy general counsel Brian Davis sent a letter to Yale's attorney Russell G. VanRozeboom stating, "We are in receipt of your April 25, 2011, email requesting certain information regarding the optional life insurance claim for John Yale on behalf of your client, Terri [sic] Yale. Please allow this letter to respond to your requests." (Doc. 11-1, at 43.) Davis's letter further stated:

> "All optional life insurance applications/enrollment forms provided
> to Watts by its employees were submitted by Watts to Sun Life
> during the open enrollment period at issue. Any Evidence of
> Insurability forms (EOI's) received by Watts from its employees
> were also forwarded to Sun Life for review and processing.
> Premium calculations were performed by Sun Life and premiums
> for each participant were reflected on a monthly invoice sent to
> Watts each month. Watts then remitted to Sun Life the monthly
> premium payments for all employees for all optional life insurance
> premiums invoiced by Sun Life. Accordingly, all optional life

> insurance applications/enrollment forms, and all EOI's, received by Watts, were submitted to Sun Life before a claim arose. Specifically, the optional life insurance application for Mr. Yale was forwarded to Sun Life prior to any claim arising and premiums were paid based on the invoices received by Watts from Sun Life."

(*Id.*) Davis's letter further stated:

> "[E]nclosed with this letter are the following documents: the Optional Life Enrollment form submitted by Ms. Yale; the prior optional life insurance carrier, Reliance Standard's, monthly invoice to Watts listing the life insurance amounts for Terri Yale and John Yale, which was provided to Sun Life; and the Death Benefits Claim Packet, together with the October 18, 2010 letter from Ms. Cheryl Lundin to Ms. Yale. [¶] Please let me know if you have any questions."

(*Id.*)

On June 8, 2011, VanRozeboom sent a letter to Kristen Goodwin stating, "The undersigned and this law firm represent Terrie [sic] Yale.  This letter will serve as the formal ERISA appeal of Sun Life's denial of Terrie Yale's claim for Optional Dependent Life Insurance benefits under Group Policy number 027578 due to the death of her husband, John H. Yale."

(Doc. 11-1, at 37.)  VanRozeboom's letter further stated:

> "We believe Sun Life to be incorrect in its assessment of the facts and the law applicable to this claim.  First, John Yale was *eligible* for $250,000 of coverage as the Group Life Insurance Policy defined this amount as the maximum benefit available for spouses. Thus, this is not a case where the benefit claimed exceeds the maximum amount specified in the policy.  The ultimate question is not eligibility, but whether Sun Life voluntarily accepted the risk or, by its conduct, *waived* its right of rejection by accepting the application tendered to it without evidence of insurability and, thereafter, computing, invoicing on a monthly basis, and collecting premiums for the designated $250,000 benefit amount."

(*Id.* at 38 (emphasis original).)  Citing *Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan,* 329 F.Supp.2d 1198 (C.D.Cal. 2004), which held an ERISA insurer may waive an evidence of good health requirement, *id.* at 1221-22, VanRozeboom's letter further stated:

> "The doctrine of waiver is applicable in ERISA cases.  Waiver is the voluntary or intentional relinquishment of a known right . . . . [¶] In the case of Sun Life, the evidence of waiver is even more pronounced [than in *Gaines*].  Sun Life did not simply accept premiums without evidence of insurability.  Rather, Sun Life, upon receipt of Terrie Yale's application, *unilaterally* calculated, billed and took receipt of the premium for $250,000 of coverage for ten consecutive months.  Under these facts, a waiver has occurred.  Sun Life cannot lawfully withhold $150,000 of benefits because it did not obtain evidence of insurability 'satisfactory to Sun Life' before requesting and receiving monthly premiums for the $250,000 benefit amount."

(Doc. 11-1, at 38 (emphasis original).)  VanRozeboom's letter further stated:

> "[W]e ask that Sun Life reverse it [sic] notice of denial, approve the claim for the full benefit amount of $250,000 and tender to Terrie Yale the $150,000 in unpaid benefits plus interest.  If you have any questions or desire additional information, please phone or write.  Thank you for your consideration."

(*Id*. at 39.)

On June 15, 2011, Goodwin sent a letter to VanRozeboom stating, "Your letter dated June 8, 2011 requesting an appeal of the above denied dependent optional life insurance claim was received in our office on June 14, 2011.  Thank you for your submission."  (Doc. 11-1, at 47.)  Goodwin's letter further stated, "[T]he entire claim file will be reviewed during the appeal process.  [¶] You will receive written notice of our decision on your appeal within 45 days after receipt of your request for appeal or by July 29, 2011.  However, the 45-day time period to make a determination may be tolled [ ] or extended if Sun Life determines that additional information and/or documentation is necessary to conduct a full and fair review of your appeal."  (*Id*.)

On July 28, 2011, Goodwin sent a second letter to VanRozeboom stating, "Your letter dated June 8, 2011 appeared to indicate that Terrie [sic] Yale completed an Evidence of Insurability application which was submitted to Sun Life.  My investigation indicates that Sun

12

1

2   Life did not receive any such form.  If, however, such a form does exist, please provide me a

3   copy to include as part of my review." (Doc. 11-1, at 63.)

4          On September 15, 2011, Goodwin sent a third letter to VanRozeboom stating, "This is to

5   follow up my correspondence to you of July 28, 2011 [ ].  To date I have not received any

6   additional information from you.  [¶] In that letter to you of July 28, I requested from you

7   information regarding Evidence of Insurability.  In your prior letter to me dated June 8, 2011,

8   you appeared to indicate that Terri [sic] Yale may have completed an Evidence of Insurability

9   application which was submitted to Sun Life.  My investigation indicates that Sun Life did not

10  receive any such form.  [¶] If you have a copy of such form and/or any evidence that such an

11  application was approved, please provide me a copy as soon as possible." (Doc. 11-1, at 64.)

12  The letter further stated, "I am given [sic] you an additional 30 days from the date of this letter to

13  submit any documentation concerning an Evidence of Insurability application that may have

14  been completed by Ms. Yale.  If I have not heard from you by October 15, 2011, I will make a

15  determination based upon the information contained in the administrative file." (*Id.*)

16         On November 10, 2011, Goodwin sent a fourth and final letter to VanRozeboom stating,

17  "I am writing in response to your letter dated June 8, 2011 in which you requested that Sun Life

18  review its denial of the Dependent Optional life insurance benefit claims under the above

19  referenced Group Policy.  As you are aware, Dependent Optional life insurance benefits in the

20  amount of $100,000, made payable to Terrie [sic] Yale, were issued on December 10, 2010.

21  Based upon the information contained in the administrative file and under the terms of the

22  policy, additional benefits are not payable." (Doc. 11-1, at 66.)  The letter further stated:

23              "In this instance, Sun Life never received nor did it ever approve
                any Evidence of Eligibility from Ms. Yale that was a policy and
24              enrollment requirement.  [¶] Ms. Yale was required to submit
                Evidence of Insurability for any requested coverage amount over

25

26                                        13

> her Guaranteed Issue of $100,000.  As no Evidence of Insurability was submitted to or approved by Sun Life, Ms. Yale was not covered for any additional Optional Dependent insurance over the amount of $100,000 when he passed away on October 10, 2010. Consequently, no additional life benefits are payable pursuant to the definition of Guaranteed Issue and Evidence of Insurability requirement as stated in the Group Policy."

(*Id*. at 73). The letter concluded, "This is the final determination with regard to this matter." (*Id*.)

---

The Court now turns to the inquiry at hand, keeping in mind that Sun Life, acting as both the claims administrator for the policy and the insurer who pays the claims, operated under a conflict of interest while processing Yale's claim.  "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest," as in this case, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

***A. Review of Sun Life's decision*** – Again, "[w]here an ERISA Plan grants 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' " like the plan at issue here, " 'a plan administrator's interpretation of [the] plan' is reviewed for abuse of discretion." *Tapley v. Locals 302 and 612 of Intern. Union of Operating Engineers-Employers Construction Industry Retirement Plan,* _F.3d_, 2013 WL 4767344 (9th Cir. 2013), at *4 (internal citations omitted).  "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert*

1

2   *Bell/Pete Rozelle NFL Players Retirement Plan,* 410 F.3d 1173, 1178 (9th Cir. 2005).[1]   The

3   abuse of discretion standard is equivalent to an " 'arbitrary and capricious' review."   *Tapley,*

4   *supra,* 2013 WL 4767344 at *4.   Under this standard, "[a] plan administrator's decision to deny

5   benefits must be upheld . . . if it is based upon a reasonable interpretation of the plan's terms and

6   if it was made in good faith."   *Sluimer v. Verity, Inc.,* 606 F.3d 584, 590 (9th Cir. 2010) (internal

7   citations, quotations omitted).   "The question is not 'whose interpretation of the plan documents

8   is most persuasive, but whether the . . . interpretation is unreasonable.' "   *Id.*

9

10  *1. Sun Life did not render a decision without explanation or construe provisions of the plan in*

11  *a way that conflicted with its plain language* – The administrative record submitted into

12  evidence shows Sun Life predicated its decision to deny the full $250,000 in claimed benefits on

13  the plan's evidence of insurability (EOI) requirement.   Specifically, Sun Life communicated to

14  Yale that for the additional $150,000 to have been added to John's $100,000 guaranteed issue

15  amount, Yale would have been required to submit an EOI along with her enrollment form, which

16  she did not.   Sun Life reiterated this explanation as the sole reason for its decision in its denial of

17  Yale's appeal.   Thus, the Court finds Sun Life did not render a decision without explanation.

18      The Court further finds Sun Life's basis for denying benefits comports with a reasonable

19  interpretation of the plan that does not conflict with the plan's plain language.   The plan

20  indicates, "Any amount elected in excess of the Guaranteed Issue Amount . . . will be subject to

21  the Evidence of Insurability requirements.   [¶] **Evidence of Insurability**, satisfactory to Sun

22  Life, will be required for an Employee's Dependent for any of the following reasons: [¶] . . . [¶]

23

24  [1] " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' "   *Boyd, supra,* 410 F.3d at 1178 (quoting *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern*

25  *California,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)).

26

– an Employee who elects an amount of Life Insurance for a Dependent in excess of the Guaranteed Issue Amount[.]"   The plan further provides, "If the Employee's or Dependent's amount of insurance exceeds the Guaranteed Issue Amount available under this Policy, any amount in excess of the Guaranteed Issue Amount is available to the Employee or Dependent *only* [1] if he has furnished Evidence of Insurability to Sun Life *and* [2] has been approved for any excess amount above the Guaranteed Issue Amount."   (Emphasis added.)   These requirements are made readily apparent to applicants on the enrollment form.  In a section on the first page of the enrollment form entitled "**Acknowledgement and Signature (Important:** You must read and sign for coverage)" (bold original), it states, "I have read the 'About Evidence of Insurability' notice on page 2 [of the enrollment form]."  That notice provides in pertinent part, "About Evidence of Insurability (also known as Proof of Good Health): [¶] Evidence of Insurability (EOI) is needed if: [¶] · You apply for higher coverage than the limits described in the Coverage Options above. [¶] . . . [¶] *If EOI is needed, your coverage will not go into effect until Sun Life Assurance Company of Canada approves it*."  (Emphasis added.)  It is undisputed John's guaranteed issue amount – the amount of dependent spouse optional life insurance he had in force on December 31, 2009 – was $100,000.  The plan expressly required Yale to provide EOI *and* be approved by Sun Life for coverage in excess of $100,000.  Nothing in the record establishes Yale supplied Sun Life with EOI prior to John's death or that Sun Life approved Yale's application for $250,000 of coverage.  Consequently, John could only have had $100,000 in dependent spouse optional life insurance at the time of his death.  Sun Life's decision to limit benefits to the $100,000 coverage level was based on a reasonable interpretation of the plan.

***2. Sun Life did not rely on clearly erroneous findings of fact*** – As her primary theory of liability, Yale first contends Sun Life's decision to deny the additional $150,000 in benefits was predicated on clearly erroneous findings of fact and therefore an abuse of discretion because under the circumstances, Sun Life waived its right to deny benefits on the basis of the EOI requirement.   Sun Life, conversely, contends it did not waive its right to rely on the EOI requirement.   Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court agrees with Sun Life and finds no waiver occurred here.

" 'Waiver' is the intentional relinquishment of known right."   *Alocozy v. U.S. Citizenship and Immigration Services,* 704 F.3d 795, 797 (9th Cir. 2012) (citing *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).   The Ninth Circuit has not determined whether the doctrine of waiver applies under ERISA, *see Capianco v. Long-Term Disability Plan of Sponsor Uromed Corp.,* 247 Fed.Appx. 885, 886 (9th Cir. 2007) (assuming, without deciding, that waiver applies), but at least one other circuit has.   *See High v. E-Systems Inc.,* 459 F.3d 573, 581 (5th Cir. 2006) (acknowledging applicability of waiver); *but see Glass v. United Of Omaha Life Ins. Co.,* 33 F.3d 1341, 1348 (11th Cir. 1994) ("leav[ing] open whether . . . waiver principles might apply under the federal common law in the ERISA context"); *Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 650 (7th Cir. 1993) ("[W]hile it might be appropriate to apply certain waiver principles to ERISA claims, the waiver principles upon which plaintiff relies are not among them"); *Farley v. Benefit Trust Life Ins. Co.,* 979 F.3d 653, 659 (8th Cir. 1992) ("Even assuming that a waiver of policy provisions could be asserted in an ERISA case, a point we do not decide, we agree . . . that nothing in Benefit Trust's letters expresses any intention to surrender its right to enforce applicable provisions of the policy other than the ones cited in those letters").

Assuming waiver principles were somehow viable here, Sun Life's conduct would not conclusively evidence a waiver.  Yale contends Sun Life "did not simply accept premiums without [EOI].  Rather, [Sun Life], upon receipt of [Yale's] application, *unilaterally* calculated, billed and took receipt of the premium for $250,000 of coverage for ten consecutive months.  [Sun Life] took this action without any EOI and without asking for an EOI although it contends an EOI was required.  Under these facts, a waiver has occurred."  (Emphasis original.)  Not so.

"Waiver *requires* the intentional relinquishment of a known right *upon knowledge of the facts*.  The burden is on the party claiming a waiver of right to prove it by clear and convincing evidence that does not leave the matter to speculation.  As a general rule, *doubtful cases will be decided against the existence of a waiver*.  [Citations.]"  *Ringler Associates Inc. v. Maryland Casualty Co*., 80 Cal.App.4th 1165, 1188, 96 Cal.Rptr.2d 136 (2000) (emphasis added); *see also O'Connor v. Provident Life and Acc. Co.,* 455 F.Supp.2d 670, 678 (E.D.Mich. 2006) ("[T]he party seeking to benefit from the waiver [must] prove that the other party was aware of the facts and chose not to assert the ineligibility at the time premiums were accepted").

Alan Hurley's February 24, 2011 letter to Derek Warner acknowledges that the deduction of premiums for $250,000 worth of coverage from Yale's salary was an administrative billing error.  However, "an error is not always a waiver.  'Certainly, someone made an error; either the employer made a mistake in deducting the premium payments without receiving approval, or the defendant [insurer] received the premiums and simply forgot to insist on evidence of insurability."  *Silva v. Metropolitan Life Ins. Co.,* 912 F.Supp.2d 781, 791 (E.D.Mo. 2012) (quoting *O'Connor, supra,* 455 F.Supp.2d at 678).  To establish a waiver, Yale must show Sun Life intentionally relinquished its right to require EOI as a precondition to Yale's obtaining $250,000 worth of life insurance for John.  That was not done here.  Indeed, the record suggests

18

Sun Life did not intentionally relinquish such right.  First, the EOI requirement, while clearly set

forth in the policy and the enrollment form, was not discussed with Yale by either Sun Life or

Watts, and it appears Sun Life was unaware that no EOI had ever been submitted with Yale's

enrollment form until it began to process Yale's claim for benefits.  Second, nothing suggests

Sun Life's billing department was aware that Yale had selected a level of coverage in excess of

John's guaranteed issue amount, and was therefore required to submit EOI, when it computed

her premiums.  Under these circumstances, Yale's claim of waiver cannot succeed.

*Gaines*, *supra,* 329 F.Supp.2d 1198, the case relied on principally by Yale, does not alter

the Court's conclusion.  Donald Gaines, the plaintiff, had purchased a $150,000 dependent life

insurance policy for his wife, Velda, through a benefit plan offered by his employer, Sargent

Fletcher, Inc.  *Id.* at 1203.  When Velda died, Sargent Fletcher, Inc. Group Life Insurance

Company (the plan administrator) and Hartford Life Insurance Company (the insurer that issued

the policy) refused to pay more than $20,000 in benefits because Gaines had not provided

Hartford with evidence of Velda's good health as was supposedly required to purchase the

additional $130,000 in coverage.  *Id.*  Gaines contended the defendants had waived the right to

deny benefits because his enrollment application contained no indication that evidence of good

health was required.  *Id*. at 1221-22.  The district court agreed:

> "Here Sargent Fletcher and Hartford knew that [Gaines] (and
> indeed many others) had not submitted a personal health statement,
> knew of the coverage being purchased, knew that premiums were
> being paid for that coverage, and received and accepted payments
> without giving any indication that any of the Sargent Fletcher
> employees had failed to comply with a precondition to obtaining
> insurance coverage.  The Court finds that conduct sufficient to
> constitute a voluntary relinquishment of the right to require
> submission of a personal health statement.  Moreover, giving effect
> to the waiver in this case does not expand the scope of the ERISA
> plan; rather it provides [Gaines] with an available benefit for which

> he paid. Thus, the Court finds that application of the waiver
> doctrine is appropriate under the present circumstances."

*Id*. at 1222.

Problematically for Yale, this case differs from *Gaines* in several critical respects. The policy brochure provided to Gaines did not mention an "evidence of good health" or "personal health statement" requirement, and the brochure implied that if medical information was required, an inquiry would be made by Hartford or Sargent Fletcher. *Gaines, supra,* 329 F.Supp.2d at 1205. The enrollment form contained in Gaines's enrollment packet likewise did not advise applicants that evidence of good health or personal health statements were required. *Id*. at 1206. Furthermore, although language in the Sargent Fletcher plan suggested evidence of good health was required under certain circumstances, other language created confusion and ambiguity on the subject. *Id*. at 1206. The *Gaines* court observed:

> "[T]he evidence of good health exclusion of coverage in this case
> requires the cross referencing of several provisions of the Plan, and
> once that is done, it is still not clear what, if anything, is actually
> required on the part of the applicant to evidence good health . . . .
> [¶] The plan does not define 'good health' or 'evidence of good
> health.' Moreover, it leaves ambiguous whether or not information
> must be provided to obtain coverage. Rather, it describes the type
> of information that *might* be requested, but only in cases where the
> information is '***required by us***.'

*Id.* at 1217 (bold, emphasis original). The court further noted:

> "[W]hile the document describes certain types of information that
> might be required, it suggests that other, undescribed materials,
> might be requested in addition to, or in lieu of, the enumerated
> items. This language is at least susceptible to an interpretation that
> such information will not be demanded in every case, and that if it
> is needed, the plan participant will be notified by the insurer of
> precisely what he or she must provide as a condition to obtaining
> coverage. All in all, the Plan's term regarding definition of good
> health could lead the insured to reasonably believe that if Hartford
> desired evidence of good health, it would ask for it, in whatever

form it desired, *e.g.,* a personal health statement, a questionnaire, a physical exam, etc."

*Id.*  In light of the foregoing ambiguities, the court, invoking the doctrines of *contra proferentem* and the reasonable expectations of the insured, *see id.*, held that "to construe the [Sargent Fletcher] Plan as requiring the submission of a personal health statement is unreasonable in [Gaines's] case, and the condition cannot be enforced against him."  *Id.* at 1218.

By contrast, the plan at issue in this case clearly states that if an employee elects an amount of dependent life insurance in excess of the guaranteed issue amount, EOI satisfactory to Sun Life is required for the dependent.  The plan also clearly states that if EOI is required, *it is the employee who must furnish EOI to Sun Life*.  The plan then defines EOI as "a statement or proof of an Employee's or Dependent's medical history."  Yale has not identified – and Court is unable to identify – any ambiguity in the provisions setting forth the EOI requirement.

In the Court's view, it is the very existence (or absence) of ambiguities that actually explains why it was possible for the *Gaines* court to find a waiver, but not possible for the Court to find one here.  Notably, under the federal common law, "the concept[ ] of waiver . . . cannot be used to create coverage beyond that actually provided by an employee benefit plan."  *Flynn v. Sun Life Assur. Co. of Canada,* 809 F.Supp.2d 1175, 1187 (C.D.Cal. 2011) (and authorities cited therein); *accord Gaines, supra,* 329 F.Supp.2d at 1222 ("Generally speaking, waiver is unavailable when it would expand the scope of coverage under an ERISA plan").  This accords with the majority rule, followed in California, that "the doctrine[ ] of implied waiver . . . , based upon the conduct or action of the insurer, [is] not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom[.]"  *Advanced Network, Inc. v. Peerless Ins. Co.,* 190 Cal.App.4th 1054, 1066, 119 Cal.Rptr.3d 17 (2010).

21

" 'ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans[.]' " *Gillam v. Nev. Power Co.,* 488 F.3d 1189, 1194 (9th Cir. 2007) (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.,* 112 F.3d 982, 985 (9th Cir. 1997)). "We therefore 'apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws.' " *Id.* " 'Accordingly, . . . an ERISA plan should be interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." ' " *Id.* "We look first to the 'explicit language of the agreement to determine, if possible, the clear intent of the parties,' and then to extrinsic evidence." *Harlick v. Blue Shield of California,* 686 F.3d 699, 708 (9th Cir. 2012) (quoting *Gillam,* at p. 1194). The threshold inquiry " 'is to determine if the [documents governing the ERISA plan] at issue [are] ambiguous or unambiguous.' " *Kamler v. H/N Telecommunications Services, Inc.,* 305 F.3d 672, 680 (7th Cir. 2002) (quoting *Neuma, Inc. v. AMP, Inc.,* 259 F.3d 864, 873 (7th Cir. 2001)). " '[I]f a document governing an ERISA plan is unambiguous, [ ] court[s] will not look beyond its 'four corners' in interpreting its meaning.' " *Id.* (quoting *Neuma, supra,* at p. 873); compare *Gillam, supra,* at p. 1194 ("When a plan is ambiguous . . . , a court typically 'will examine extrinsic evidence to determine the intent of the parties' ").

The ambiguities in the Sargent Fletcher plan allowed the *Gaines* court to construe the exclusionary language in that case against the defendants, and to find the submission of a personal health statement or evidence of good health was not an express requirement of the plan, as the defendants had contended. As a result, holding defendants' conduct constituted a waiver of the claimed requirement did not enlarge the scope of coverage under the plan, *Gaines, supra,* 329 F.Supp.2d at 1222, and was therefore permissible as a matter of law. But again, the Sun Life plan, unlike the Sargent Fletcher plan, clearly and unambiguously puts employees on notice that

a dependent's EOI is required for dependent life insurance in excess of the guaranteed issue amount, and that coverage in excess of the guaranteed issue amount is available only if the employee or dependent has furnished EOI to Sun Life and been approved for the excess amount. A finding that Yale's payment – and Sun Life's acceptance – of premiums for $250,000 worth of coverage constituted a waiver of the EOI requirements would be "in direct conflict with the plain written terms of" the plan. *White v. Provident Life & Acc. Ins. Co.,* 114 F.3d 26, 29 (4th Cir. 1997). "ERISA, however, does not provide for such unwritten modifications of ERISA plans." *Id.* (citing 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to written instrument"); 29 U.S.C. § 1102(b) ("Every employee benefit plan shall--[¶] . . . [¶] (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan")). In other words, Sun Life's computation, billing and acceptance of premiums could not have overridden the plan's express EOI requirements.

At most, Yale might be able to contend (unconvincingly, in the Court's view) that the term "evidence of insurability" is ambiguous because the policy defines it to mean "a statement or proof an Employee's or Dependent's medical history," without any indication of what a statement or proof of medical history should resemble. But even that would not salvage Yale's waiver argument: in contrast to *Gaines*, where it was unclear not simply what applicants had to submit as evidence of good health, but whether applicants had to submit anything at all, Yale was clearly required to submit *something* as EOI, and it is undisputed that she submitted *nothing*.

To the extent Yale intends to argue a "form of estoppel [that] is, for practical purposes, indistinguishable from the doctrine of implied waiver through conduct," *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.,* 144 Cal.App.4th 1175, 1190, 51 Cal.Rptr.3d 144 (2006), in the sense Sun Life should be estopped from relying on the EOI requirement because it

affirmatively misled her into believing EOI was not required by computing and accepting premiums for $250,000 worth of coverage without EOI and without requesting EOI, the claim likewise fails.  This form of estoppel "is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts."  *Old Republic Ins. Co. v. FSR Brokerage, Inc.,* 80 Cal.App.4th 666, 678, 95 Cal.Rptr.2d 583 (2000) (internal citations, quotations omitted).  As with all forms of estoppel, "the party claiming the estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse,' and that reliance *must have been reasonable in that the party claiming the estoppel did not know nor should it have known* that its adversary's conduct was misleading."  *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (emphasis added); *see Renfro v. Funky Door Long Term Disability Plan,* 686 F.3d 1044, 1054 (9th Cir. 2012) ("A beneficiary may recover benefits under ERISA based on an equitable estoppel theory, if he shows: (1) a material misrepresentation, (2) *reasonable* and detrimental reliance on the representation; (3) extraordinary circumstances; (4) *the provisions of the plan at issue are ambiguous, such that reasonable persons could disagree as to their meaning or effect*; and (5) the representations must have been made to the beneficiary involving an oral interpretation of the plan")(emphasis added).

Under the federal common law, which, again, has developed in the ERISA context, courts follow the doctrine of reasonable expectations only to the extent that ambiguities – i.e., language that is not clear, plain and conspicuous – must be construed against the party who caused the uncertainty to exist (the insurer) in order to protect the insured's objectively reasonable expectations of coverage.  *See Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 386-87 (9th Cir. 1994).  Stated differently, there can be no resort to reasonable expectations

in instances where no ambiguity exists in the language of an ERISA plan.  Federal common law has not recognized that portion of the doctrine, adopted in some states, *see, e.g., Wilkie v. Auto-Owners Ins. Co.,* 469 Mich. 41, 53 n. 15, 664 N.W.2d 776 (Mich. 2003), holding an otherwise unambiguous policy may be found to be ambiguous where an insurer, through its conduct, induces an insured to expect coverage that is contrary to the express language of the policy or that the policy does not afford.  *See Pirkheim v. First Unum Life Ins.,* 229 F.3d 1008, 1011 (10th Cir. 2000) ("General ERISA principles simply do not permit us to re-write the terms of the insurance contract.  Where the insuring clause or exclusionary provision is conspicuous, clear, and unequivocal . . . application of the . . . doctrine of reasonable expectations is improper").

Notwithstanding the fact Yale has failed to identify an ambiguity in any material provision of the policy, *see Renfro, supra,* 686 F.3d at 1054, Yale cannot show her reliance on Sun Life's asserted conduct was reasonable.  The plan and enrollment form indicate EOI (1) is needed for coverage in excess of the guaranteed issue amount and that if EOI is needed, (2) coverage will not go into effect until Sun Life approves it, and the plan itself clearly indicates EOI (3) must be provided to Sun Life by the applicant.  Given the plain language of the plan, it was *unreasonable* for Yale to view Sun Life's computation and acceptance of premiums for $250,000 worth of coverage without EOI and without requesting EOI as excusing the requirement she submit EOI to Sun Life and be approved for coverage before coverage could become effective.  Accordingly, the Court concludes Sun Life's decision to deny benefits was not arbitrary and capricious.  Sun Life's decision to deny benefits must therefore be upheld.

***B. Full and fair review of Yale's claim*** – As her second and final theory of liability, Yale further contends Sun Life did not conduct a full and fair review of her claim.  ERISA requires that every

employee benefit plan "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).

Yale first contends, "[Sun Life]'s ERISA investigation shows that it received multiple applications from Watts's employees and calculated the premium based on the applications forms and sent corresponding monthly billings to Watts.  [Sun Life]'s failure (or refusal) to investigate for other instances of EOI waiver does not comport with a full and fair review of [Yale]'s claim."  ERISA "mandates that a fiduciary shall 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . .'  Consequently, [a plan fiduciary] has the responsibility to fully investigate [ ] claims before denying benefits."  *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1199-1200 (11th Cir. 2010) (quoting 29 U.S.C. § 1104(a)(1)).  Problematically for Yale, this duty extends only to an investigation of the events and circumstances surrounding the claim at issue.  *See Capone, supra,* at p. 1199; *see also Brown v. Retirement Committee of Briggs & Stratton Retirement Plan,* 575 F.Supp. 1073, 1076 (1983) (plan administrator "has a limited duty . . . to investigate evidence *bearing upon the claim*") (emphasis added).  That is to say, Sun Life only had to investigate whether *Yale's* claim was meritorious as part of a full and fair review.  Yale has provided no authority – and the Court's research reveals no authority – to support the proposition that Sun Life was required to investigate the circumstances surrounding the claims of other plan participants, as Yale contends.

Yale further contends Sun Life did not conduct a full and fair review because it misrepresented material facts in its review of Yale's appeal.  Specifically, Yale contends, "[Sun

Life] concealed the true facts behind its false assertion that '[m]onthly billing statements are provided to Watts, but all are generated based on information from *its* maintained billing database.' [Citation.]  The record reflect[s] [Sun Life] generated the information from [Yale]'s application and *not* from Watts' 'billing database' as represented."  This argument refers to a portion of Kristen Goodwin's November 20, 2011 letter to Russell VanRozeboom in which Goodwin describes how the billing system works.  Goodwin's letter stated in pertinent part:

> "Watts . . . is responsible for maintaining proper benefit information within its data base [sic].  This includes not only the proper collection of premiums, but also distribution to employees of proper Policy documents.  Watts is responsible for insuring that all information provided to Sun Life for billing purposes is accurate.  This also includes the updating and maintaining of its on-line billing database.  Monthly billing statements are provided to Watts, but all are generated based on information from *its* maintained billing database."

(Doc. 11-1, at 72-73.)   Yale now contends Goodwin's statements were patently false, and therefore did not comport with a full and fair review of Yale's claim, because several Sun Life internal emails contained in the administrative record (*see id.*, at 52-55) appear to show that Sun Life's own billing department received enrollment forms from Watts employees, calculated the applicable premiums, and then generated billed invoices which were presumably sent to Watts.

The Court, cognizant of Sun Life's inherent conflict of interest, has given no weight to Goodwin's description of the billing process.   Accordingly, the Court has not relied on Goodwin's description in any part of its analysis herein.  That being said, the Court finds Yale has nevertheless not succeeded in showing Sun Life's review was incomplete and/or not impartial.  First, the administrative record is insufficiently detailed for the Court to determine whether Yale's account of the billing process is a more accurate one, as she implies, and should therefore be given some weight.  Second, and perhaps more importantly, Sun Life did not assert

its understanding of the billing process as grounds for denying Yale's claim or Yale's appeal.  In its denial of Yale's claim, Sun Life asserted Yale's failure to provide EOI as the sole basis for the denial.  (*See* Doc. 11-1, at 19.)  Sun Life chose to stand on this particular premise as the sole basis for denying Yale's appeal.  (*See* Doc. 11-1, at 73.)  Sun Life's understanding of the billing process was discussed by Goodwin in her letter to VanRozeboom only inasmuch as she sought to distinguish Sun Life's billing process from Sargent Fletcher's/Hartford's billing process as discussed in *Gaines, supra* (see Doc. 11-1, at 72-73), which VanRozeboom had cited in his June 8, 2011 letter to Goodwin as the reason why he believed the doctrine of waiver was applicable in the case at hand.  (*See* Doc. 11-1, at 37.)  Under these circumstances and in light of the Court's conclusion waiver is inapplicable and *Gaines* is inapposite to the facts here, the Court cannot conclude Sun Life failed to provide Yale with the full and fair review to which she was entitled.

## V. DISPOSITION

Based on the foregoing, it is hereby ORDERED and ADJUDGED:

1.  Plaintiff Terry J. Yale shall take nothing by way of her complaint against defendant Sun Life Assurance Company of Canada; and

2.  Defendant Sun Life Assurance Company of Canada shall have judgment against plaintiff Terry J. Yale; and

3.  The parties shall bear their own attorneys' fees and costs.

The Court respectfully directs the Clerk of Court to enter judgment in accordance with this order and to thereafter close the case.

IT IS SO ORDERED.

Dated:   October 30, 2013

_____

SENIOR  DISTRICT  JUDGE

29